WATERMAN STEAMSHIP CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6500–66.   Filed July 31, 1968.

*William H. Armbrecht, Jr.*, *Marshall J. DeMouy*, and *Louis H. Anders, Jr.*, for the petitioner.

*Robert G. Faircloth*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable period January 1, 1955, through May 5, 1955, in the amount of $196,744.93.

Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision whether the distribution of a promissory note by Pan-Atlantic Steamship Corp. in the principal sum of $2,799,820 to Waterman Steamship Corp. was a dividend or part of the purchase price for the sale by Waterman Steamship Corp. of the stock of Pan-Atlantic Steamship Corp. and Gulf Florida Terminal Co., Inc., to McLean Securities Corp.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner was incorporated under the laws of the State of New York on April 27, 1965, and had its principal office in Mobile, Ala. at the date of the filing of the petition in this case. Petitioner is the successor by merger to Waterman Steamship Corp. (hereinafter referred to as Waterman) which was incorporated under the laws of the State of Alabama and which had its principal office at Mobile, Ala. Pursuant to the terms of the merger agreement which was in compliance with the laws of New York and Alabama, Waterman Steamship Corp., the New York corporation, was the corporation surviving the merger which occurred on or about May 11, 1965. Petitioner assumed all of the obligations and liabilities and succeeded to all of the properties, assets, rights, claims, and interests of the Alabama corporation.

Petitioner's predecessor and its subsidiaries filed a consolidated U.S. Corporation Income Tax Return for the period January 1, through May 5, 1955 with the district director of internal revenue at Birmingham, Ala. Pan-Atlantic Steamship Corp. was included in the consolidation until January 21, 1955.

During the year 1954 and until January 21, 1955, Malcom P. McLean (hereinafter referred to as McLean) was the president, a director, and the majority stockholder of McLean Trucking Co., a North Carolina corporation (hereinafter referred to as Trucking).

Trucking was engaged in the trucking business as a common carrier under a certificate issued by the ICC and was subject to ICC regulation. In January of 1955 Trucking had approximately 1 million shares of common stock outstanding, and was a publicly held and publicly traded corporation. McLean owned approximately 58 per-

cent of the stock of Trucking, his brother James owned approximately 10 percent, and his sister Clara owned approximately 3 percent. James and Clara were also officers and directors of Trucking.

During the year 1954 McLean became interested in transporting the trailers hauled by tractor trucks on ships between certain ports in the United States. He contemplated moving highway trailers by ship between the major U.S. ports in the Gulf of Mexico and parts of the eastern seaboard of the United States. This operation is sometimes referred to as a "piggy back" by water operation. He contemplated rolling trailers on and off the ship without having to unload the cargo from the trailer and therefore needed ships suitable for such purpose.

In early 1954 McLean had Trucking attempt to acquire a business which was a common carrier by water from Key West, Fla., to Portland, Maine. Trucking filed an application for ICC approval of the acquisition. There was opposition to such approval from the trucking, water carrier, and railroad industries. Because of the amount of opposition to Trucking's proposed acquisition, McLean was of the opinion that action on the application would not be taken for 4 or 5 years.

McLean began looking for a coastwise water carrier with sufficient assets that he would be willing to make the purchase if it required his disposing of his stock in Trucking in order to avoid obtaining the approval of the ICC for the purchase.

Waterman was the sole owner of two subsidiaries named Pan-Atlantic Steamship Corp. (hereinafter referred to as Pan-Atlantic) and Gulf Florida Terminal Co., Inc. (hereinafter referred to as Gulf Florida). Waterman during 1954 and until May 5, 1955, was a publicly held corporation. It was engaged in the steamship business between ports throughout the world during 1954 and 1955 and has continued to be so engaged. Pan-Atlantic was engaged in the coastwise shipping business between U.S. ports. Gulf Florida was engaged in the terminal, stevedoring, and steamship agency business.

McLean originally considered making an offer to purchase the stock or assets of Waterman. However, because Waterman and two of its subsidiaries, Pan-Atlantic and Gulf Florida, each held ICC certificates and because Waterman and Pan-Atlantic were both water carriers, for a noncarrier to have acquired control of Waterman would in the opinion of McLean's advisers, have required approval by the ICC. Therefore, even if McLean divested himself of any interest in Trucking, he was of the opinion that he could not have acquired control of Waterman without ICC approval.

After receiving advice from his attorneys that his acquisition of control of Waterman could not be arranged in such a manner as

not to require approval by the ICC, McLean presented to Waterman a written offer, dated December 20, 1954, to purchase all of the issued and outstanding capital stock of Pan-Atlantic and of Gulf Florida. This offer provided in part as follows:

M. P. McLean of Winston-Salem, North Carolina, hereby offers to purchase all of the capital stock of Pan-Atlantic Steamship Corporation and all of the capital stock of the Gulf Florida Terminal Company, Inc. subject to the following terms and conditions.

1. $3,500,000.00 in cash to be paid to Waterman Steamship Corporation for all of the capital stock of the two companies, Pan-Atlantic Steamship Corporation and the Gulf Florida Terminal Company, Inc.

\* \* \* \* \* \* \*

7. On closing date to be agreed upon by Waterman and the purchaser and simultaneously with the payment for the stock, a meeting of the Board of Directors of Pan-Atlantic Steamship Corporation and the Gulf Florida Terminal Company, Inc. shall be held, the present directors shall resign and nominees of the purchaser shall be elected to constitute all of the then members of the board, and these nominees shall take their position as such Directors at this meeting.

This offer was intended as an offer by McLean or his nominee. Although McLean was interested in acquiring the assets of Pan-Atlantic, the offer was made to purchase the stock because in an asset acquisition the ICC certificate held by Pan-Atlantic could not have been transferred without ICC approval.

The board of directors of Waterman met on December 21, 1954, to consider McLean's offer. After reading the offer to the board of directors, Waterman's president pointed out that there had been under consideration for some time the payment of a dividend by either Pan-Atlantic or Gulf Florida to Waterman in an amount of over $2,500,000, that it was the view of management that such a dividend could and should be paid, and that because of the tax consequences he would oppose any sale of the stock prior to payment of the dividend, but would consider favorably recommending a sale of the stock after the payment of the dividend. Upon the recommendation of Waterman's president, the board rejected McLean's $3,500,000 cash offer for the stock of Pan-Atlantic and Gulf Florida, but agreed to make a counteroffer. The board adopted the following resolution:

Be It Resolved that Mr. N. Nicholson, President of Waterman Steamship Corporation, be and he is hereby authorized and directed to advise Mr. M. P. McLean of Winston-Salem, North Carolina, that the Directors of Waterman Steamship Corporation have declined to accept and have refused his written offer made under date of December 20, 1954 with respect to the purchase of the capital stock of Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc.; and

Be It Further Resolved that Mr. Nicholson, as President of Waterman Steamship Corporation, be and he is hereby authorized and directed to make a written

counter-proposal to Mr. McLean substantially in the form of the draft of a counter-proposal as submitted to this meeting; and

BE IT FURTHER RESOLVED that the Vice President & Treasurer and the Vice President & General Counsel of Waterman Steamship Corporation be and they are hereby directed to give study and consideration to the matter of the payment of dividends by Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., one or both, in the aggregate not exceeding $2,800,000.00, and to make a recommendation as to the most suitable method and form for declaring and paying such dividend or dividends; and

BE IT FURTHER RESOLVED that the draft of the counter-proposal hereby directed to be made to Mr. M. P. McLean be and the same hereby is ordered attached to and made a part of these minutes.

Pursuant to the authorization of the board of directors, Waterman, by its president, wrote a letter to McLean dated December 23, 1954, declining to accept McLean's offer of December 20, 1954, as made, and making a counterproposal offering to sell McLean or his nominee all of the capital stock of Pan-Atlantic and Gulf Florida upon and subject to, among others, the following terms and conditions:

1. Waterman Steamship Corporation agrees to sell to you or to your nominee all of the capital stock which it owns in Pan Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., which constitutes all of the issued and outstanding capital stock of said corporations, at and for the price of $700,000.00 to be paid in cash, after the Directors of said corporations shall have declared and arranged for payments of dividends to the present stockholder, Waterman Steamship Corporation, amounting in the aggregate to $2,800,000.00.

\* \* \* \* \* \* \*

8. Upon a closing date not later than February 1, 1955, to be agreed upon by Waterman Steamship Corporation and you or your nominee, and simultaneously with the delivery of the stock and the payment therefor, a meeting of the Board of Directors of Pan Atlantic Steamship Corporation and a meeting of the Directors of Gulf Florida Terminal Company, Inc., shall be held, the present Directors shall resign, and your nominees, or those of your nominee, shall be elected to constitute all of the then members of the Boards and such nominees shall assume their positions as Directors at such meetings.

9. Without limitation as to any other conditions, this agreement is expressly conditioned upon the submission of requisite documentary proof such as will satisfy the Vice President and General Counsel of Waterman Steamship Corporation that neither you nor your nominee is a carrier subject to the provisions of Parts 1, 2 or 3 of the Interstate Commerce Act at the time of the acquisition of the stock of the two corporations as contemplated herein, and that Interstate Commerce Commission approval is not necessary with respect to the transfer of stock contemplated.

In the event this agreement, with respect to the purchase of stock and the payment therefor, shall not have been carried out and completed on or prior to February 1, 1955, this agreement shall be null and void.

Discussions and negotiations between officers of Waterman and McLean ensued during the next month pertaining to the proposed sale of the stock of Pan-Atlantic and Gulf Florida.

On December 27, 1954, McLean contacted his legal counsel in New York City and from that date through January 21, 1955, remained in frequent contact with his attorneys. From December 27, 1954, through January 21, 1955, McLean's attorneys worked steadily in arranging and formulating a method for acquisition of the stock which would not require ICC approval and resolving other problems involved in the acquisition which was the subject of the counteroffer made to McLean.

On January 14, 1955, Trucking organized McLean Securities Corp., a Delaware corporation, the name of which was later changed to McLean Industries, Inc. (hereinafter referred to as Securities). Securities initially issued to Trucking 1 million shares of common stock at 1 cent per share or $10,000 cash. Shortly thereafter, Malcolm, James, and Clara McLean and Garrard Winston paid for additional shares of Securities. McLean purchased 190,000 shares and Winston purchased 10,000 shares.

On Monday, January 17, 1955, Trucking declared and shortly thereafter paid a dividend of one share of Securities common stock on each of the 1 million shares of outstanding Trucking stock. After the payment of such dividend, Securities was publicly traded in the over-the-counter market. Arrangements were being made to place the stock of Trucking owned by McLean and his brother and sister in a management trust so that when Securities would acquire the stock of Pan-Atlantic and Gulf Florida, the person in control of Securities (McLean) would not be in control of a carrier since if an entity controlled by a person who controlled another carrier acquired the stock of Pan-Atlantic and Gulf Florida, ICC approval of the acquisition might be required. On January 21, 1955, the trust agreement with respect to the Trucking stock of McLean, his brother, and sister was executed. Under the agreement the beneficial owners of the stock were divested of all control over the stock or operation of the company and such control placed in the trustee.

McLean and his attorney went to Mobile, Ala., late on January 20, 1955. The agreement of the company selected to act as trustee of the trust to which the Trucking stock was to be transferred was not finally secured until the afternoon of January 20, 1955. Other arrangements which McLean found it necessary to make were concluded shortly prior to January 20, 1955. On the morning of January 21, 1955, McLean's attorney went to the office of Waterman's general counsel to review and discuss a draft of a proposed purchase agreement which had been prepared by Waterman's general counsel. While McLean's attorney was reviewing the draft of the purchase agreement, Waterman's general counsel was reviewing the trust agreement which was to be executed

as a method of divesting McLean of control of Trucking. At 12 noon on January 21, 1955, the board of directors of Pan-Atlantic met and declared dividends on both its preferred and common stock to its stockholders of record on January 20, 1955, in the form of a promissory note in the total amount of $2,799,820.00 payable on or before February 20, 1955, and bearing interest of 4 percent. The minutes of the meeting at which this dividend was declared state in part as follows:

He [Waterman's president] recommended to the Directors that such dividend be declared, but, inasmuch as the corporation does not have available at this time sufficient cash to pay this dividend and also a dividend which he is proposing to recommend on the Common stock, he recommended, further, that this dividend be declared and be paid by and in the form of a promissory note of Pan-Atlantic Steamship Corporation, to be executed and delivered forthwith upon declaration of the dividend to Waterman Steamship Corporation, its sole stockholder, payable on or before February 20, 1955, bearing interest at the rate of 4% per annum.

The Chairman said that, inasmuch as there remains sufficient surplus net assets for such purpose after declaration of the dividend as above provided on the Preferred stock, he would recommend the declaration of a dividend on the Common stock in the amount of $2,689,374.00, to be paid by and in the form of a promissory note of Pan-Atlantic Steamship Corporation, to be executed and delivered, forthwith upon declaration of the dividend, to Waterman Steamship Corporation, its sole stockholder, payable on or before February 20, 1955, with interest at 4% per annum.

He recommended that the dividend on the Preferred stock and the dividend on the Common stock, if declared, be declared payable and deliverable in the form of one promissory note, as above outlined, to stockholders of record as at the close of business on January 20, 1955.

The dividends were paid by execution and delivery of the promissory note. At 12:30 p.m. a special meeting of the board of directors of Securities to authorize the purchase and financing thereof of all the stock of Pan-Atlantic and Gulf Florida was held. At 1 p.m., the board of directors of Waterman met to authorize the sale of the stock of Pan-Atlantic and Gulf Florida to Securities.

Immediately following the meeting of the board of directors of Waterman the closing agreement dated January 21, 1955, between Securities and Waterman covering the purchase by Securities of all of the stock of Pan-Atlantic and of Gulf Florida was executed and delivered. This agreement provided in part as follows:

Without limitation as to any other agreement to guarantee or indemnify Waterman against loss in this instrument contained, McLean guarantees prompt payment and discharge of the respective liabilities and obligations of Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., to all persons whomsoever as reflected by the books of Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., on the date of this instrument, including but without limitation, payment of any note or notes given by either corporation as a dividend, declared prior to the date hereof.

Securities' check for $700,180 was delivered to Waterman and Waterman delivered to Securities certificates for all of the stock of Pan-Atlantic and Gulf Florida. The trust agreement with respect to the stock of McLean and his brother and sister in Trucking was executed prior to the execution of the closing agreement. Also, on January 21, 1955, sometime prior to the execution of the closing agreement with respect to the purchase and sale of the Pan-Atlantic and Gulf Florida stock, McLean and his brother and sister resigned as officers and directors of Trucking and its subsidiaries.

At 1:30 p.m. on January 21, 1955, a special meeting of the new board of directors of Pan-Atlantic was held, presided over by McLean. At this meeting the board authorized the corporation to borrow $2,500,000 from McLean and deliver a note to him, and to borrow $299,820 from Securities, and to issue a check to Waterman for $2,799,820 in payment of the note Pan-Atlantic had issued to Waterman as a dividend.

McLean borrowed the $2,500,000 which he lent to Pan-Atlantic from Bethlehem Steel Corp., the loan being made to him immediately following the purchase of the Pan-Atlantic and Gulf Florida stock by Securities. Negotiations for this loan had been in progress for sometime prior to January 21, 1955.

On January 21, 1955, prior to the declaration and payment of amounts totaling $2,799,820 as dividends, Pan-Atlantic had earnings and profits of a least $2,799,820. Waterman's basis in the stock of Pan-Atlantic was $576,180, and its basis in the stock of Gulf Florida was $124,000. The adjusted basis for tax purposes of the total assets less total liabilities of Pan-Atlantic at December 31, 1954, was $3,913,346 and the adjusted basis for tax purposes of the total assets less total liabilities of Gulf Florida as of December 31, 1954, was $279,199.

Sometime during the period from January 21, 1955, through May 5, 1955, C. Lee Co., Inc., became a wholly owned subsidiary of Securities. On May 5, 1955, C. Lee Co., Inc., purchased substantially all of the stock of Waterman for cash.

On July 6, 1955, McLean transferred Pan-Atlantic's note of $2,500,000 to Securities in exchange for 50,000 shares of preferred stock in Securities. The reason for this transfer was that there was a public underwriting of stock of Securities taking place and the underwriters insisted that the $2,500,000 indebtedness not be owed by Securities' subsidiary, Pan-Atlantic, to an individual.

On October 31, 1955, Securities sold the notes of Pan-Atlantic in the principal sum of $2,500,000 and $299,820 to Waterman for cash.

About 3 years later on July 21, 1958, Waterman declared a dividend in kind to Securities of the $2,500,000 note. Subsequently, Securities

contributed the $2,500,000 to Pan-Atlantic as paid-in capital by marking the note as paid.

Later in the year 1958 Pan-Atlantic paid the sum of $299,820 to Waterman in settlement of its note in that amount.

Petitioner on its consolidated income tax return eliminated from income the $2,799,820 declared dividend from Pan-Atlantic to Waterman and reported as the sales price of the stock of Pan-Atlantic and Gulf Florida the amount of $700,180.

Respondent in his notice of deficiency increased petitioner's reported income by capital gain of $2,799,533.80 with the following explanation:

It is determined that you realized a long-term capital gain in the amount of $2,799,533.80, as computed below, resulting from the sale of stock in Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc. which you failed to report on your return. Accordingly, taxable income is increased by $2,799,533.80.

OPINION

Petitioner takes the position that Waterman was the equitable as well as legal owner of the stock of Pan-Atlantic when the dividend of $2,799,820 was declared, that the issuance of Pan-Atlantic's note for $2,799,820 to Waterman was payment of the dividend "in property" while Waterman was the legal and equitable owner of the Pan-Atlantic stock[1] and that because the dividend was declared and paid while Waterman was the legal and equitable owner of the Pan-Atlantic stock the $2,799,820 constituted a dividend paid by Pan-Atlantic to Waterman. Petitioner relies on the provision of respondent's Income Tax Regulations (sec. 1.61–9(c))[2] that:

---

[1] Petitioner calls attention to the fact that this Court has recognized that a dividend may be paid by a note citing *T. R. Miller Mill Co.*, 37 B.T.A. 43 (1939), affd. 102 F. 2d 599 (C.A. 5, 1939). Since respondent does not contend that as a matter of law a note may not be issued in payment of a dividend we do not consider such an issue to be involved in this case.

[2] Sec. 1.61–9(c), Income Tax Regs.

(c) *Dividends on stock sold.* When stock is sold, and a dividend is both declared and paid after the sale, such dividend is not gross income to the seller. When stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller. When stock is sold between the time of declaration and the time of payment of the dividend, and the sale takes place at such time that the purchaser becomes entitled to the dividend, the dividend ordinarily is income to him. The fact that the purchaser may have included the amount of the dividend in his purchase price in contemplation of receiving the dividend does not exempt him from tax. Nor can the purchaser deduct the added amount he advanced to the seller in anticipation of the dividend. That added amount is merely part of the purchase price of the stock. In some cases, however, the purchaser may be considered to be the recipient of the dividend even though he has not received the legal title to the stock itself and does not himself receive the dividend. For example, if the seller retains the legal title to the stock as trustee solely for the purpose of securing the payment of the purchase price, with the understanding that he is to apply the dividends received from time to time in reduction of the purchase price, the dividends are considered to be income to the purchaser.

When stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller. * * *

Petitioner also relies on cases such as *Joseph L. O'Brien Co.*, 35 T.C. 750 (1961), affd. 301 F. 2d 813 (C.A. 3, 1962), and *Sam E. Wilson, Jr.*, 27 T.C. 976 (1957), affirmed per curiam 255 F. 2d 702 (C.A. 5, 1958), which hold that a dividend declared and paid after the stockowner-taxpayer has contracted to sell such stock subject to contingencies stated in the contract is the income of the seller where the dividend is paid prior to the happening of the contingencies. These cases recognize that a "dividend" has been paid and is income either to the seller or purchaser. The problem resolved in these cases is whether the beneficial ownership of the stock had passed from the seller to the purchaser when the dividend was paid.

Respondent does not argue that the transaction whereby Waterman sold its stock in Pan-Atlantic to Securities was in form one whereby either the legal or equitable ownership of the stock passed from Waterman to Securities prior to the meeting of the board of directors of Pan-Atlantic at 12 noon on January 21, 1955, at which the dividend was declared or prior to the execution by the officers of Pan-Atlantic of the promissory note and delivery of the note to Waterman. It is respondent's position that irrespective of the form of the transaction whereby Waterman sold the stock of Pan-Atlantic to Securities, the substance of the transaction was a payment by Securities to Waterman of $3,500,000 for the Pan-Atlantic stock. The import of respondent's argument is that in substance no dividend was declared or paid by Waterman. Respondent argues that the action of the board of directors of Pan-Atlantic at its meeting held at 12 noon on January 21, 1955, in declaring a dividend and the action of the officers of Pan-Atlantic in executing and delivering a note to Waterman in payment of the dividend were mere subterfuge. Respondent takes the position that the entire procedure of the declaration and payment of a dividend by Pan-Atlantic to Waterman was a device designed to give the appearance of a dividend to a part of the purchase price of the Pan-Atlantic stock and that no purpose was served by causing a part of the purchase price of the stock to be labeled a "dividend" except the avoidance of income tax by Waterman. To support his position respondent points out that McLean had offered Waterman $3,500,000 for the Pan-Atlantic and Gulf Florida stock, that Waterman wanted to realize $3,500,000 if it disposed of the stock of these two subsidiaries, that Waterman did in fact realize $3,500,000 when it disposed of this

stock of the two companies, that Pan-Atlantic did not have available cash to pay the dividend and that the entire $3,500,000 came by way of moneys procured by the purchaser to be paid over to Waterman. Respondent also stresses the fact that in the sales agreement between Waterman and Securities, the latter guaranteed prompt payment of the dividend note.

From the facts we have set forth in our findings, we conclude that Waterman in making its counter offer to McLean did plan the proposed sale in a way intended to result in Waterman receiving $3,500,000 with funds obtained by McLean or his nominee (Securities) with approximately $2,800,000 of the amount designated as a dividend and with none of the assets owned by Pan-Atlantic or Gulf Florida being removed from those companies prior to the sale of the stock. It is also apparent that it was understood between the parties to the sale of the Pan-Atlantic stock that the purchaser would arrange promptly after the sale of the stock to supply Pan-Atlantic by loan or otherwise with the funds to pay the dividend note. Petitioner does not deny that the terms of Waterman's offer to McLean were carefully drawn with the intent of accomplishing a receipt by Waterman of cash of $3,500,000 from disposition of all its interest in Pan-Atlantic and Gulf Florida with approximately $2,800,000 of the amount received being an intercompany dividend which would be eliminated from taxable income because of the filing by Waterman and its subsidiaries of a consolidated Federal income tax return. Petitioner points out that except for the fact that Pan-Atlantic and Gulf Florida each had an ICC certificate which could not be directly transferred without approval by the ICC, Pan-Atlantic could have declared a dividend in kind to Waterman and thereafter Waterman could have sold these assets to Securities, or Pan-Atlantic could have directly sold its assets to Securities, or Pan-Atlantic could have merged with Waterman and the assets which had previously belonged to Pan-Atlantic could have been sold to Securities. Petitioner states that since Pan-Atlantic's basis in its assets exceeded $3,500,000, no taxable income would have resulted from a sale of the Pan-Atlantic assets to Securities under any one of these arrangements. However, McLean was interested in having Securities acquire either the stock or assets of Pan-Atlantic and Gulf Florida only if the acquisition could be accomplished without the necessity of obtaining ICC approval. A fair inference from the record is that Waterman was interested in selling the stock or assets of Pan-Atlantic and Gulf Florida only if the sale could be made without the necessity of obtaining ICC approval. Both parties to the sale were aware of the fact that the obtaining of ICC approval of a sale of the assets or stock of Pan-Atlantic and Gulf Florida might

require several years and thus delay consummation of the sale for that period of time. The offer made by Waterman to McLean was intended to result in Waterman's receiving in cash an amount it considered to be the approximate value of the assets of Pan-Atlantic and Gulf Florida without realizing taxable income from the transaction while carrying out the transaction in a manner which would not require ICC approval. Since the transaction was planned to accomplish these purposes, the parties were careful that no firm contract for the sale of the Pan-Atlantic and Gulf Florida stock to Securities was entered into until after Pan-Atlantic had declared a dividend and paid the dividend to Waterman by delivery of its promissory note to Waterman. Therefore, even though officers of Waterman were kept advised by McLean as to the progress being made in working out the details necessary to enable Securities to accept the offer of Waterman before February 1, 1955, there was no actual acceptance of the offer or legally binding contract of sale of the stock until after the dividend was declared and the note delivered. No official action approving the sale was taken by the board of directors of either of the corporations which were the parties to the sale (Waterman and Securities) until after the dividend was declared and the note delivered. From the record we conclude that the transaction was deliberately and advisedly planned and executed in this manner. We do not, however, agree with respondent that it follows from the fact that the transaction was planned and carried out in such a form as to result in the realization by Waterman of no taxable income, that the substance of the transaction differs from its form. The substance here certainly was not a passing of the equitable interest in the stock to Securities followed by the declaration of a dividend resulting in Securities receiving a dividend. Securities borrowed the money to pay off the Waterman note from its major stockholder, McLean. Securities took neither cash nor assets out of Pan-Atlantic but the stock of that company represented Securities' entire interest in the company.

Securities did pay to Waterman for the Pan-Atlantic and Gulf Florida stock and in discharge of the notes given by Pan-Atlantic to Waterman as a dividend a total amount of $3,500,000. This was the same amount that McLean had offered to pay to Waterman for the Pan-Atlantic and Gulf Florida stock. However, Waterman had declined McLean's offer as made. Waterman refused to sell the Pan-Atlantic and Gulf Florida stock for $3,500,000 cash. The crux of the problem here is whether the planned form of the transaction here had sufficient substance so that it should be recognized for tax purposes. Both parties accept the principle that a taxpayer can conduct his affairs in such a manner as to minimize his tax liability if there is sub-

stance to the transaction. The parties cite and discuss a number of cases involving sales of stock where the issue was whether some amount received by the seller out of the corporate assets, either by the corporation assigning such asset to the seller or declaring a dividend to the seller prior to the closing of the sale, was a part of the purchase price of the stock. Most of these cases turn on the precise provisions of the agreement of the parties. See *John R. West*, 37 T.C. 684 (1962).

Both parties discuss and distinguish from the instant case, the case of *Steel Improvement & Forge Co.*, 36 T.C. 265 (1961), revd. 314 F.2d 96 (C.A. 6, 1963). Respondent states that the facts of the instant case show even more strongly than did the facts in the *Steel Improvement & Forge Co.* case that in substance the transaction between the seller and purchaser was that the amount designated as a dividend was in fact a part of the purchase price of the stock. From this statement respondent concludes that the opinion of the United States Court of Appeals for the Sixth Circuit reversing our decision supports his position in the instant case but that our holding in *Steel Improvement & Forge Co.*, supra, is not in conflict with his position.

Petitioner argues that our conclusion in *Steel Improvement & Forge Co.*, supra, is a proper interpretation of the law but that the holding of the Sixth Circuit is not in conflict with the petitioner's position herein since the Sixth Circuit concluded that in substance the equitable ownership of the stock which was being sold by the taxpayer involved in that case had, pursuant to a written contract of sale, passed to the purchaser of the stock before the declaration of the dividend and for that reason the Sixth Circuit considered that the dividend was a part of the purchase price of the stock. Petitioner states that since there was no firm contract for the sale by Waterman of the Pan-Atlantic stock to Securities either written or oral prior to the declaration of the dividend, the *Steel Improvement & Forge Co.* case is distinguishable from the instant case.

In *Steel Improvement & Forge Co.*, supra, the taxpayer was negotiating with a Canadian company for the sale to the Canadian company of its stock in a Canadian subsidiary. During the negotiations it developed that the taxpayer wanted to realize $900,000 from the sale of the stock and the prospective purchaser was willing to have the taxpayer realize this amount from the sale but was unwilling to purchase the stock for this price because of the undistributed income which the corporation had accumulated which would affect the nature under Canadian law of the future distribution by the corporation to the purchaser. The parties, therefore, agreed that the corporation would declare a dividend of its surplus to the seller prior to the closing of the sale in the amount of its undistributed surplus. It was specifically

agreed that an amount up to $180,000 could be declared as a dividend but if no dividend were declared the purchase price of the stock would be increased by only $64,000. The corporation did not have the cash to pay a dividend and it was agreed that the prospective purchaser would arrange for a loan to the corporation. After the offer of the seller outlining these terms had been accepted by the prospective purchaser and the prospective purchaser had arranged for a loan to the corporation so that the dividend might be paid in cash, a dividend of $116,000 was declared and paid and the following day the sale of the stock was closed and the certificates delivered. The taxpayer in that case contended that in substance the purchaser was the beneficial owner of the stock when the dividend was declared and paid and therefore in substance the dividend was a part of the purchase price of the stock. Respondent contended that the agreement of the parties was that a dividend be paid to the taxpayer and that the substance as well as the form of the transaction was a payment of a dividend to the taxpayer. We held for respondent stating that the payment of the dividend to the seller was an integral part of the agreement with respect to the sale of the stock. We pointed out that the purchase price of the stock would not have been increased by the $116,000 if the dividend had not been paid and that the dividend was declared and paid prior to the closing of the sale and the transfer of the stock. The Sixth Circuit, in *Steel Improvement & Forge Co.* v. *Commissioner*, 314 F. 2d 96, 97–98 (C.A. 6, 1963), reversing our opinion (36 T.C. 265), stated:

It is petitioner's contention that even though the payment was in the form of a dividend, it is necessary to look behind the surface of the transaction to determine its true character, and that such examination discloses that in substance the payment was actually a part of the purchase price. In support of this position, petitioner cites five cases which it claims are here controlling. It is true that a sum paid in the form of dividends resulting in purchase price reductions by varying formulae was in each of these cases held not taxable as ordinary income, but subsequent to sale the stock was retained as security for the balance of the purchase price by the seller. Here, however, the petitioner retained full control and ownership of the subsidiary and caused distribution to be made to itself, and simply excluded the amount of the dividend from the purchase price. On the basis of this distinction the Tax Court, after a detailed review of these cases found them to be without application, but we find ourselves unable to share that view. Rather, we incline to the position taken by the dissenting member of the Tax Court and conclude that the disputed dividend is properly taxable as ordinary income to the party having beneficial ownership of the stock at the time when the dividend is established, it being that party who bears the operating risks of the business and stands to benefit from profits or suffer detriment from losses.

This conclusion seems particularly appropriate under the facts of the present case, wherein it clearly appears from the record of the negotiations that the parties considered the $116,000 at issue to be part of the purchase price. In those negotiations petitioners said it must realize $900,000, purchaser made a direct

payment to petitioner of $634,000 and, in effect, made arrangements for payment of a balance by checks for $150,000 and for $116,000. The fact that the latter was in the technical form of a dividend does not alter the fact that it constituted a portion of the $900,000 purchase price arrived at by negotiation. Thus, looking behind the technical form to determine the substance, we conclude that like the rest of the $784,000, the $116,000 was a part of the purchase price demanded and received by the petitioner, and is accordingly taxable as a capital gain rather than as ordinary income.

Respondent contends that in the instant case as in *Steel Improvement & Forge Co.* v. *Commissioner*, *supra*, the seller wanted to obtain a fixed amount for its stock, the purchaser was willing to pay that amount for the stock and the designation of a portion of the agreed price as a "dividend" did not in substance change the nature of the payment from a part of the purchase price of the stock to a dividend. From this analysis respondent concludes that it follows from the holding of the Sixth Circuit in *Steel Improvement & Forge Co.* v. *Commissioner*, *supra*, that his position in the instant case is correct.

Petitioner contends that the primary basis of the Sixth Circuit's holding in *Steel Improvement & Forge Co.* v. *Commissioner*, *supra*, was that the beneficial interest in the stock had passed to the purchaser under a written sales contract when the dividend was declared and that there was no similar contract in the instant case. Petitioner states that in the instant case the facts show that neither Securities nor McLean had formally accepted Waterman's offer prior to the declaration of the dividend. While there was a general understanding between the parties as of the morning of January 21, 1955, that all parties were prepared to conclude the transaction, petitioner argues that the absence of a firm agreement by the parties to the definite terms of the sale prior to the declaration and payment of the dividend distinguishes this case from *Steel Improvement & Forge Co.* It is petitioner's position that a general understanding that a sale will ensue does not cause the purchaser to have the "beneficial ownership" of the stock at the time the dividend is declared or to be the party "who bears the operating risks of the business and stands to benefit from profits or suffer detriment from losses." If petitioner in this argument is distinguishing between a dividend declared and paid to the seller after execution of a written agreement for sale of stock and a dividend declared and paid prior to execution of a written agreement for sale of stock but after a general understanding as to the sale of the stock (not finally reduced to writing), has been arrived at between the purchaser and seller, the distinction is a shadowy one. However, we recognize that there are numerous cases which have turned on similar shadowy distinctions in the area of who is the recipient of corporate dividends or distributions in kind or who is the equitable owner of corporate stock.

Petitioner states that in a transaction of the type here involved, the parties have the right to cast the transaction in terms most beneficial to them. We agree with petitioner that in negotiating for sales of corporate stock, declarations of corporate dividends or sales of corporate assets, the parties may properly so arrange the form of the transactions as to reduce or eliminate the taxable income resulting therefrom. Where the transaction is carried out in a recognized form to accomplish its purpose and is not a sham or subterfuge, its substance should not be considered to differ from its form merely because the same result might have been accomplished by the parties by another method which would have produced a higher tax.

In *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, 454–455 (1950), the Court stated in this regard:

This language does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution.[3] While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes * * *

Here, * * * the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere "conduit" for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes.

The oddities in tax consequences that emerge from the tax provisions here controlling appear to be inherent in the present tax pattern. * * *

Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate. It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. Here as in the Court Holding Co. case we accept the ultimate findings of fact of the trial tribunal. Accordingly the judgment of the Court of Claims is *affirmed*.

[3] What we said in the Court Holding Co. case was an approval of the action of the Tax Court in looking beyond the papers executed by the corporation and shareholders in order to determine whether the sale there had actually been made by the corporation. We were but emphasizing the established principle that in resolving such questions as who made a sale, fact finding tribunals in tax cases can consider motives, intent, and conduct in addition to what appears in written instruments used by parties to control rights as among themselves. See, *e.g., Helvering* v. *Clifford,* 309 U.S. 331, 335–337; *Commissioner* v. *Tower,* 327 U.S. 280.

In the instant case because Waterman and Pan-Atlantic had filed consolidated returns, Waterman was permitted by respondent's regulations to eliminate from income dividends paid to it by Pan-Atlantic.

Since this treatment of the intercompany dividend was permitted, Waterman was entitled to arrange its affairs so as to obtain the resultant tax advantage. This is what was done. Pan-Atlantic declared a dividend to Waterman prior to the sale by Waterman of the Pan-Atlantic stock to Securities.

Unless a taxpayer who is contemplating a sale of stock may not for reasons influenced by the tax consequences of the sale refuse to sell that stock until after the accumulated earnings of the corporation have been declared as a dividend without having the declaration of the dividend disregarded for Federal tax purposes, Pan-Atlantic did in substance declare a dividend to Waterman. Generally, where a sale of stock is under consideration, the price a seller is willing to take or a purchaser is willing to pay prior to removal from the corporation of some or all of its accumulated earnings by payment of a dividend, will be greater by approximately the amount of the dividend than the price after a dividend has been declared and paid to the seller. Where the parties to the sale are in agreement as to whether a dividend is to be paid to the seller and the equitable interest in the stock as well as legal title thereto remain in the seller until after the dividend is declared and paid, the dividend is that of the seller. We do not consider that the mere fact that the corporation finds it necessary to pay the dividend by a note and to borrow the money to pay that note or the fact that the prospective purchaser arranges the loan causes the substance of the transaction to change. We therefore conclude that Waterman did receive a dividend of $2,799,820 from Pan-Atlantic prior to its sale of the Pan-Atlantic stock.

Because of other adjustments to petitioner's taxable income which are not in issue here,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

TANNENWALD, *J.*, dissenting. I think the majority fails to recognize the basic issue involved in this case. We are not called upon to decide to whom a conceded dividend should be taxable as such but rather whether there was any dividend at all.

Concededly, the distinctions drawn in determining the tax effects of corporate distributions are "shadowy." See *Waltham Netoco Theatres, Inc.*, 49 T.C. 399, 404 (1968), on appeal (C.A. 1, Apr. 24, 1968). But this difficult fact does not require us to blind ourselves to the realities of a situation and exalt form over substance.

The plain unadulterated fact is that no dividend was declared or paid by Pan-Atlantic to Waterman or anyone else. The note issued by

Pan-Atlantic was merely a piece of paper, which served only a temporary purpose and disappeared. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). The funds with which ultimate payment was made by Pan-Atlantic were supplied by McLean and were not received by Waterman until after the sale was completed. McLean offered to pay $3,500,000 as the purchase price and that is precisely the amount it finally paid. When the transaction was completed, Pan-Atlantic was no richer and no poorer than it had been at the start. Only a portion of its accumulated earnings and profits had been converted into capital.

In *Steel Improvement & Forge Co.* v. *Commissioner*, 314 F. 2d 96 (C.A. 6, 1963), reversing 36 T.C. 265 (1961), both this Court and the Court of Appeals dealt with the issue involved upon the assumption that a dividend had been paid and that it was necessary to decide to whom the dividend was taxable. The case is therefore inapposite. Moreover, I note a distinguishing fact that in *Steel Improvement & Forge Co.*, the dividend was actually paid in cash before the sale was closed.

RAUM, DAWSON, and SIMPSON, *JJ.*, agree with this dissenting opinion.