SAM E. WILSON, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ADA ROGERS WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 35639, 35640. Filed March 20, 1957.

*Robert B. Payne, Esq.*, and *J. A. Martin, Esq.*, for the petitioners.
*M. Clifton Maxwell, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* The petitioners returned the $33,950 in question as dividend income, that being the manner in which the cancellation of the account receivable was reflected on both the books of Wil-Tex and of Wilson. Petitioners now contend that they erred in treating the $33,950 as a dividend.

It may at this juncture be observed that the adjustments made by the Commissioner to the net community income reported by petitioners on their returns, which resulted in the deficiencies, are not in issue. Petitioners did not assign error as to them. What petitioners now assign as error in the present proceeding is as follows:

The Commissioner erred in failing to treat as long term capital gain a certain amount of $33,950.00 which Petitioners erroneously included in their gross ordinary community income as a dividend from Wil-Tex Oil Corporation.

As to the foregoing assignment of error, the petitioners have the right to make it. Even though they did include the $33,950 as a dividend in their income tax returns, they are not estopped from now alleging that

they erred in so doing. However, it seems clear to us, notwithstanding the date of cancellation of the debt was not January 31, 1948, as recorded on the books, that petitioners did not err in treating the transaction as a dividend. It is perfectly clear that Wilson was indebted to Wil-Tex in the sum of $33,950 and that Wil-Tex, at Wilson's instance, canceled this indebtedness without the payment to it by Wilson of any sum whatsoever. It is also clear that Panhandle had nothing to do with the cancellation of the debt. Wilson was entirely solvent and fully able to pay the debt at the time it was canceled. These facts, we think, make the transaction result in a taxable dividend to petitioners, as we shall endeavor to point out more fully hereafter in this Opinion.

Petitioner's contention that the cancellation of the debt was not the payment of a dividend to Wilson, as urged on brief, is based upon several different grounds which we will hereafter discuss separately.

First, petitioner contends that the cancellation of the debt only served to reduce the consideration which Panhandle had previously agreed to pay for the stock, and therefore that it did not result in any benefit to him. This contention is necessarily based on the assumption that, within the meaning of the contract, the account receivable due to Wil-Tex from Wilson was a current asset at the time the net sales price of the stock was to be fixed. If it was not, it would not affect the sales price of the Wil-Tex stock.

The contract with Panhandle fixed the consideration for the Wil-Tex stock at $4,000,000, less net liabilities, and net liabilities were defined as "the total liabilities of Wil-Tex other than the capital stock and surplus, less the aggregate amount of the current assets of Wil-Tex, all as shown by the balance sheet of Wil-Tex at the close of business on February 28, 1948." This date was subsequently changed by agreement to March 31, 1948. By that time the $33,950 account was no longer on the books; it had been canceled. It is doubtless true, as petitioners argue, that a business concern actively carrying on a business would have its accounts receivable classed as current assets. This is illustrated by the fact that, when the sale by Wilson to Panhandle of his stock in Wil-Tex was consummated on April 10, 1948, and the net sales price of the Wil-Tex stock was computed in accordance with the formula which the parties had agreed upon on February 10, 1948, among the current assets of Wil-Tex on March 31, 1948, were accounts receivable of $147,640.92. But the account which Wilson owed Wil-Tex at the time the contract was signed was not a part of that $147,640.92. That much is certainly clear. According to the stipu-

lation now filed it had been canceled at some time prior to February 29, 1948, and was no longer on the books of Wil-Tex. Therefore, assuming that the $33,950 account was a current asset at all times that it was carried on the books of Wil-Tex, it seems to us that that fact, under the circumstances present in the instant case, can make no difference. We still think the cancellation represented ordinary income to the petitioners and not long-term capital gain.

The petitioner argues that his gain was fixed on February 10, 1948, and that the gain accrued to him on that date and that the subsequent cancellation was only a prepayment of part of the purchase price of the stock by Panhandle. In order to accept the petitioner's argument it would be necessary for us to hold that Panhandle agreed to pay $4,000,000, less net liabilities as shown by a balance sheet at the close of business on February 10, 1948, and that any reduction in current assets would be prepayments by Panhandle. We cannot make such a holding because the contract specifically provides otherwise. February 28, 1948, was to be the date for the determination of net liabilities (subsequently advanced to March 31, 1948). The consideration that Panhandle agreed to pay was based on the current assets as of March 31, 1948, not February 10, 1948. Panhandle, we have no doubt, recorded its cost basis for the stock as $4,000,000, less net liabilities on March 31, 1948; not the $4,000,000, less net liabilities on February 10, 1948. Wil-Tex was doing business between February 10, 1948, and March 31, 1948, and its current assets and liabilities undoubtedly fluctuated. Any reduction in current assets and/or increase in liabilities was not in any sense tantamount to a prepayment by Panhandle of the price it agreed to pay the petitioner for the stock. Petitioner's argument that the cancellation of the debt by Wil-Tex amounted to such a prepayment of part of the purchase price of the stock and therefore resulted in long-term capital gain to Wilson rather than ordinary income is rejected.

The petitioner next argues that the cancellation, if a dividend, was ordinary income to Panhandle, the purchaser, and part of the purchase price to Wilson, the seller, since Panhandle, and not he, received the economic benefit of it. We held in our prior decision in this cause that the cancellation represented a dividend and was ordinary income to the petitioner. Despite our additional finding that the cancellation occurred subsequent to February 10, 1948, and prior to February 29, 1948, our former holding must stand.

The dividend is "inexorably someone's income." *DeGuire* v. *Higgins*, 159 F. 2d 921, 923 (C. A. 2, 1947); and that "someone" is the

beneficial owner of the shares upon which the dividend was paid. *Moore* v. *Commissioner*, 124 F. 2d 991 (C. A. 7, 1941). The petitioner argues that beneficial ownership of the stock passed to Panhandle on February 10, 1948. As we stated previously, his argument ignores the contract. The contract did not provide for a security device or for title to remain in the vendor merely to secure the unpaid portion of the purchase price. Cf. *Moore* v. *Commissioner, supra; DeGuire* v. *Higgins, supra; Northern Trust Co. of Chicago* v. *United States*, 193 F. 2d 127 (C. A. 7, 1951) ; *Estate of Arthur L. Hobson*, 17 T. C. 854 (1951). Here, title and all of the incidents of ownership remained with the petitioner until the closing date. The only thing that petitioner was required to do was to see that Wil-Tex operated its properties in a reasonable and prudent manner until the closing date. This undoubtedly was to protect the oil properties which were the principal assets of Wil-Tex, for which Panhandle was paying the purchase price agreed upon in the contract. The *manner* of determining the purchase price was fixed, but the purchase price itself was not determined or determinable on February 10, 1948.

It seems to us that the essential factor in this whole matter is that at the time of entering into the contract of sale on February 10, 1948, petitioner was indebted to Wil-Tex on open account in the amount of $33,950. Nothing at all was said in the contract concerning this indebtedness. However, the evidence makes it clear that petitioner wanted the account off the books of Wil-Tex before the sale to Panhandle was consummated. In order to accomplish this, the account was canceled in the manner shown in our Findings of Fact.

Since, therefore, the cancellation did not benefit Panhandle and that corporation had nothing whatever to do with it, but rather was of benefit to Wilson and was at his instance, we uphold the respondent's contention. The argument that Wilson might have accomplished the same over-all result by leaving the $33,950 account on the books of Wil-Tex unpaid and thus increase the sales price of his Wil-Tex stock to Panhandle and return the gain as long-term capital gain instead of as ordinary income and then later pay the account to Wil-Tex, we think is without significance. We are governed by what was done, rather than what might have been done. Cf. *Merrill C. Gilmore*, 25 T. C. 1321 (1956).

The petitioner's final argument is that in the admitted state of Wil-Tex's depletion reserve, the cancellation fell within the provisions of Treasury Regulations 111, section 29.115–6, causing it to be taxed as a gain from the sale or other disposition of property as provided in

section 29.111-1. The pertinent parts of the Internal Revenue Code of 1939 and Regulations 111 are printed in the margin.[1]

It has been stipulated as follows:

For the single taxable year ending February 29, 1948, Wil-Tex had earnings or profits, not taking into consideration the $33,950.00 transaction in litigation herein nor so much of the depletion reserve as was based on cost depletion, of $237,017.20. * * *

The Code itself is clear. Section 115 (a) defines a dividend as a distribution by a corporation "(2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made." Section 115 (b) creates a presumption that the distribution is from the most recent earnings and profits. Since there were current earnings and profits of $237,017.20, the distribution of $33,950 is a dividend; see *Stanley V. Waldheim*, 25 T. C. 839, 849 (1956); *William G. Maguire*, 21 T. C. 853, 854 (1954), reversed on another issue 222 F. 2d 472 (C. A. 7, 1955). Section 115

---

[1] Internal Revenue Code of 1939.

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

*       *       *       *       *       *       *

(b) SOURCE OF DISTRIBUTIONS.—For the purpose of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings and profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113. The preceding sentence shall not apply to a distribution which is a dividend within the meaning of the last sentence of subsection (a).

*       *       *       *       *       *       *

(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend.

Regulations 111.

SEC. 29.115-6. DISTRIBUTIONS FROM DEPLETION OR DEPRECIATION RESERVES.—A reserve set up out of gross income by a corporation and maintained for the purpose of making good any loss of capital assets on account of depletion or depreciation is not a part of surplus out of which ordinary dividends may be paid. A distribution made from a depletion or a depreciation reserve based upon the cost or other basis of the property will not be considered as having been paid out of earnings or profits, but the amount thereof shall be applied against and reduce the cost or other basis of the stock upon which declared. If such a distribution is in excess of the basis, the excess shall be taxed as a gain from the sale or other disposition of property as provided in section 29.111-1. * * * No distribution, however, can be made from such a reserve until all the earnings or profits of the corporation have first been distributed.

(d), therefore, would not apply because it refers to a distribution that is not a "dividend."

Regulations 111, section 29.115–6, promulgated pursuant to section 115 (d) of the 1939 Code provide that distributions from depletion reserves based on cost shall be applied against the basis of the stock and if in excess of such basis shall be treated as a capital gain. This section also provides that "[n]o distribution, however, can be made from such a reserve until all the earnings or profits of the corporation have first been distributed." Petitioner contends that, despite the clear wording of the Code itself, the distribution is from a depletion reserve because *all the earnings and profits* means the total earnings and profits for all years, including the current year, and that all earnings and profits have been distributed since there is a deficit for all years rather than earnings and profits. In view of the clarity of the Code provisions we cannot approve such a construction. Such a construction would render the definition—a dividend is a distribution from current earnings and profits—meaningless for any corporation which had a depreciation or depletion reserve and also had a net deficit for all years.

The petitioner contends that there were no current earnings and profits when you consider the depletion reserve. That is not so. When the reserve is credited, earnings and profits are charged with a like amount. Therefore, the amount in the reserve has been considered in determining all earnings and profits, viz, earnings and profits prior to depletion charges have been reduced by the depletion charges or by the same amount of the reserve account.

The petitioner also argues that if section 115 of the 1939 Code is construed contrary to his contention, it is unconstitutional because it taxes a return of capital as ordinary income. There is no merit to this argument. Petitioner had a zero basis for the Wil-Tex stock; therefore, the amount he realized because of his ownership or disposition of this stock would be income to him. See *Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509 (1921). He had no capital to be returned. Since it is income, Congress has the power to tax it and to set the rate, and Congress has done so.

Accordingly,

*Decisions will be entered for the respondent.*