**WATERMAN STEAMSHIP CORPORA-
TION, Petitioner-Appellee,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.**

**No. 27563.**

United States Court of Appeals,
Fifth Circuit.

July 15, 1970.

Rehearing Denied and Rehearing En Banc
Denied Sept. 17, 1970.

Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., Richard M. Hahn, Acting Chief Counsel, Internal Revenue Service, Matthew J. Zinn, Atty., U. S. Dept. of Justice, Tax Div., Chris J. Ray, Atty., Internal Revenue Service, Washington, D. C., Lester B. Snyder, Meyer Rothwacks, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

William H. Armbrecht, Jr., Marshall J. DeMouy, Clifford Foster, III, Mobile Ala., for appellee.

Before WISDOM, SIMPSON and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

This case involves another attempt by a taxpayer to ward off tax blows with paper armor. The issue for decision is whether the declaration and payment, in the form of a promissory note,[1] of $2,-799,820 by Pan-Atlantic Steamship Corporation to its parent, Waterman Steamship Corporation, was a tax-free, inter-

---

1. The question whether a note, as a matter of law, may be issued in payment of

a dividend was not litigated in the Tax Court.

company dividend, as the Tax Court concluded? 50 T.C. 650. Or was it part of the purchase price paid to Waterman in a sale by Waterman of the stock of Pan-Atlantic and Gulf Florida Terminal Company to McLean Securities Company, as the Commissioner contends? If the payment is to be accorded dividend status then Waterman (because Waterman, Pan-Atlantic, and Gulf Florida filed consolidated tax returns) would be permitted to eliminate from income the dividends paid by Pan-Atlantic. Int. Rev.Code of 1954, §§ 1501–1504.[2] See Treas.Reg. § 1.1502–14; –31A(b) (1) (ii); –31A(b) (2) (ii) (1969). If on the other hand, the payment is to be considered part of the purchase price paid to Waterman, this payment would be included in Waterman's gross income as taxable income and the tax on the gain from the sale would be governed by Sections 1001 and 1002 of the Internal Revenue Code of 1954. The Tax Court, with four judges dissenting, held that the note reflected a true dividend and was not part of the purchase price. The Tax Court's decision was predicated on the dividend distribution having been declared and paid to Waterman before the equitable, beneficial, or legal ownership of the stock had passed to the purchaser. See Treas.Reg. § 1.61–9(c) (1957). The Commissioner appeals from that decision. We reverse.[3]

## I.

The record in this case presents a circular factual pattern of intriguing financial negotiations. Because we must consider the substance of the transactions, it is important to go into the facts at some length.

During 1954 and until May 5, 1955, Waterman was a publicly held corporation engaged in the steamship business throughout the world. Until January 21, 1955, Waterman was the sole owner of two subsidiary corporations, Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Incorporated. Pan-Atlantic was engaged in the coastal shipping business in the United States. Gulf Florida was engaged in the terminal, stevedoring, and steamship agency business. Each of the three companies held coastwise certificates issued by the Interstate Commerce Commission. Waterman and its subsidiaries filed consolidated income tax returns for the period January 1, 1955, through May 5, 1955. Pan-Atlantic was included in the affiliated group until January 21, 1955.

In 1954, Malcolm P. McLean was the president and majority stockholder in McLean Trucking Company (Trucking).[4]

Trucking was engaged in the interstate trucking business and operated under an interstate commerce certificate issued by the ICC. During the early part of that year, McLean sought to expand Trucking's base of operations by acquiring a common carrier by water. Trucking would then be able to move trucks and highway trailers by ship between United States ports. In what is known as a "piggy back operation" the vehicles would be able to roll on and off a ship without having to unload.

2. The statutory authorization for filing consolidated tax returns is set forth in Chapter 6 of Subtitle A of the Internal Revenue Code of 1954. Subchapter A of Chapter 6, Sections 1502–1505, pertains to filing consolidated returns and the payment of tax. Subchapter B, Sections 1551–1552 and 1561–1563, contains related rules for consolidated returns. *See* Caps, The Law Regarding Consolidated Returns, 21 S.Cal.Tax Inst. 191 (1969); Lees, New Regulations Regarding Consolidated Returns, 19 S.Cal.Tax Inst. 243 (1969).

3. This appeal involves federal income taxes in the amount of $510,100.85 for the taxable period January 1, 1955, through May 5, 1955. This amount represents the Tax Court determination of an overpayment of taxes by the taxpayer and reflects the resolution of other issues not involved in this appeal. A decision in favor of the Commissioner has the effect of substituting a tax deficiency of $190,-000 for the overpayment.

4. McLean owned approximately 58% of the one million shares of the outstanding capital stock.

McLean, through Trucking, applied to the ICC for approval of the acquisition of a common carrier by water that held an ICC coastwise certificate. Rail, water carrier, and trucking interests strongly opposed the application. McLean, concluding that ICC approval might require a four or five year struggle, withdrew the application. McLean was interested in acquiring the assets of Waterman and its subsidiaries. His attorneys advised him, however, that ICC approval would be required for such an acquisition, since Waterman and its subsidiaries held ICC certificates, and that his control of Trucking (also under ICC jurisdiction) would prohibit his acquiring another carrier without ICC approval. McLean's attorneys advised him that ICC approval would not be necessary if he divested himself of control in Trucking (by a management trust) and acquired the stock instead of the assets of Pan-Atlantic and Gulf Florida.

Accordingly, December 20, 1954, McLean made a written offer to Waterman to purchase all of the issued and outstanding capital stock of Pan-Atlantic and Gulf Florida for $3,500,000.[5] December 21, 1954, the board of directors of Waterman considered McLean's offer at a special meeting. After Waterman's president read the offer to the directors, he pointed out that there had been under consideration for some time the payment of a dividend by Pan-Atlantic and Gulf Florida to Waterman of approximately $2,800,000. He stated that management's view was that the dividend should be declared and paid but that because of the adverse tax consequences he would oppose any sale of the stock before payment of the dividend. He did, however, recommend a sale of the stock for $700,180[6] after the payment of the dividend. Since Waterman's tax basis for the stock of these two subsidiaries totalled $700,180 ($576,180 allocated to Pan-Atlantic and $124,000 to Gulf Florida), a sale of these stocks for $3,500,000 would have produced a taxable gain of approximately $2,800,000. On the other hand, since the Treasury Regulations on consolidated returns provide that dividends received from affiliated corporations are exempt from tax (Sec. 1.1502–31A(b) (1) (i) and Sec. 1.1502–31A(b) (2) (ii), a sale of stock in these subsidiary corporations for $700,000, after a dividend payment to Waterman of $2,800,000 would purportedly have produced no taxable gain.

The Board rejected McLean's offer, but authorized Waterman's president to submit a counterproposal. December 23, 1954, Waterman submitted a written counterproposal to sell to McLean, or his nominee, all of the capital stock in Pan-Atlantic and Gulf Florida "at and for the price of $700,000 to be paid in cash, after the Directors * * * shall have declared and arranged for payments of dividends to the present stockholder, Waterman Steamship Corporation, amounting in the aggregate of '$2,800,000". The only condition attached to the proposal was that ICC approval would not be necessary at the time of acquisition.[7]

---

5. This offer provided in part:
    *    *    *    *
    M. P. McLean of Winston-Salem, North Carolina, hereby offers to purchase all of the capital stock of Pan-Atlantic Steamship Corporation and all of the capital stock of the Gulf Florida Terminal Company, Inc., subject to the following terms and conditions.
    1. $3,500,000.00 in cash to be paid to Waterman Steamship Corporation for all of the capital stock of the two companies, Pan-Atlantic Steamship Corporation and the Gulf Florida Terminal Company, Inc.
    *    *    *    *    *

6. This amount represented Waterman's tax basis in the stock of the two subsidiaries.

7. The counterproposal provided in part:
    *    *    *    *    *
    1. Waterman Steamship Corporation agrees to sell to you or to your nominee all of the capital stock which it owns in Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company,

During the next month, there were numerous discussions and negotiations between the officers of Waterman and McLean's representatives concerning the counterproposal. McLean's attorneys then began to formulate a plan for acquisition of the stock, which would not, in their opinion, require ICC approval. The plan they formulated required that a new corporation be formed to be the purchaser of Pan-Atlantic and Gulf Florida stock. Trucking would acquire one million shares of the stock and distribute such stock to its stockholders as a dividend on a share per share basis. McLean and his brother and sister would place their Trucking stock in an irrevocable management trust before there was any agreement or commitment to purchase the stock of Pan-Atlantic and Gulf Florida and before the new corporation or McLean acquired control or the power to control Pan-Atlantic or Gulf Florida.

January 14, 1955, Trucking organized McLean Securities Corporation (Securities).[8] Securities issued to Trucking one million shares of common stock at one cent a share.

January 17, Trucking declared and paid as a dividend one share of Securities common stock on each share of the one million shares of outstanding Trucking stock.[9] At this same time, arrangements were made to place McLean's Trucking stock in the management trust.

This was necessary so that when Securities acquired the stock of the two subsidiaries, the person in control of Securities, McLean, would not be in control of a carrier. McLean's attorneys believed that ICC approval would be required if an entity, controlled by a person who controlled another carrier, acquired the stock of Pan-Atlantic and Gulf Florida. According to the terms of the trust agreement McLean would divest himself of control over the stock and operation of the company and such control would be placed in the trustee.

January 20, McLean and his attorneys, after receiving the assent of the United States Trust Company to act as trustee for the management trust, went to Mobile, Alabama, where Waterman had its principal office. Although no firm agreement had been reached as of January 20, McLean went to Mobile expecting to complete the negotiations for the acquisition of the stock of Pan-Atlantic and Gulf Florida.

On the morning of January 21, McLean's attorney went to the office of Waterman's general counsel to review the proposed purchase agreement prepared by Waterman. At the same time, Waterman's general counsel reviewed the proposed trust agreement prepared by McLean's attorney. At noon on January 21, the board of directors of Pan-Atlantic met and declared a dividend of $2,799,820 to its stockholders of record

Inc., which constitutes all of the issued and outstanding capital stock of said corporations, at and for the price of $700,000.00 to be paid in cash, after the Directors of said corporations shall have declared and arranged for payments of dividends to the present stockholder, Waterman Steamship Corporation, amounting in the aggregate to $2,800,000.00.

\* \* \* \* \*

9. Without limitation as to any other conditions, this agreement is expressly conditioned upon the submission of requisite documentary proof such as will satisfy the Vice President and General Counsel of Waterman Steamship Corporation that neither you nor your nominee is a carrier subject

to the provisions of Parts 1, 2 or 3 of the Interstate Commerce Act at the time of the acquisition of the stock of the two corporations as contemplated herein, and that Interstate Commerce Commission approval is not necessary with respect to the transfer of stock contemplated.

\* \* \* \* \*

8. The name of this corporation was subsequently changed to McLean Industries Incorporated.

9. As a result of the dividend payment, McLean received approximately 580,000 shares of Securities. McLean then purchased 190,000 additional shares of the stock, bringing his holdings in Securities to 770,000 shares.

on January 20. Since Pan-Atlantic did not have available sufficient cash to pay the dividend, the dividend was declared in the form of a promissory note in the amount of $2,799,820.[10] The note was payable on or before February 20, 1955.[11]

The dividends were paid by the execution and delivery of the note.

At 12:30 p. m., a special meeting of the board of directors of Securities was held to authorize the purchase and financing of all of the stock in the two companies. The minutes of that meeting reflect that Securities and McLean were to lend Pan-Atlantic $279,820 after the stock purchase.

At 1:00 p. m., a meeting of the board of directors of Waterman was held to discuss the sale of the stock in the two companies. Waterman's president stated that the Company had received a promissory note of $2,799,820 in payment of dividends on its Pan-Atlantic stock and that McLean, through Securi-

ties, would be able to purchase the subsidiaries without ICC approval. He then recommended that both the preferred and common stock of Pan-Atlantic and the common stock of Gulf Florida be sold to Securities for $700,180. The board approved the sale.

Waterman's president then informed McLean of the board's approval of the proposed sale. It was at this time that McLean executed the trust agreement divesting himself of control of Trucking. The closing agreement for the sale of the subsidiaries' stock was then executed.[12]

At 1:30 p. m., the new board of directors of Pan-Atlantic held a special meeting. McLean presided. The board authorized the corporation to borrow $2,500,000 from McLean personally and $299,820 from Securities. Notes for these amounts were delivered to McLean and Securities. Pan-Atlantic then issued a check to Waterman for $2,799,820

---

10. There is no dispute that Pan-Atlantic had earnings and profits of at least $2,799,820 as of January 21.

11. The minues of the meeting at which the dividend was declared:

> \*   \*   \*   \*   \*
>
> He [Waterman's president] recommended to the Directors that such dividend be declared, but, inasmuch as the corporation does not have available at this time sufficient cash to pay this dividend and also a dividend which he is proposing to recommend on the Common stock, he recommended, further, that this dividend be declared and be paid by and in the form of a promissory note of Pan-Atlantic Steamship Corporation, to be executed and delivered forthwith upon declaration of the dividend to Waterman Steamship Corporation, its sole stockholder, payable on or before February 20, 1955, bearing interest at the rate of 4% per annum.
>
> The Chairman said that, inasmuch as there remains sufficient surplus net assets for such purpose after declaration of the dividend as above provided on the Preferred stock, he would recommend the declaration of a dividend on the Common stock in the amount of $2,689,374.00, to be paid by and in the form of a promissory note of Pan-Atlantic Steamship Corporation, to be executed and delivered, forthwith upon

declaration of the dividend, to Waterman Steamship Corporation, its sole stockholder, payable on or before February 20, 1955, with interest at 4% per annum.

> He recommended that the dividend on the Preferred stock and the dividend on the Common stock, if declared, be declared payable and deliverable in the form of one promissory note, as above outlined, to stockholders of record as at the close of business on January 20, 1955.
>
> \*   \*   \*   \*   \*

12. This agreement provided in part:

> \*   \*   \*   \*   \*
>
> Without limitation as to any other agreement to guarantee or indemnify Waterman against loss in this instrument contained, McLean guarantees prompt payment and discharge of the respective liabilities and obligations of Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., to all persons whomsoever as reflected by the books of Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, Inc., on the date of this instrument, including but without limitation, payment of any note or notes given by either corporation as a dividend, declared prior to the date hereof.
>
> \*   \*   \*   \*   \*

in payment of the note Pan-Atlantic had issued to Waterman for the dividend.[13]

By the end of the day and within a ninety minute period, the financial cycle had been completed. Waterman had $3,500,000, hopefully tax-free, all of which came from Securities and McLean, the buyers of the stock.[14]

II.

Waterman in its consolidated income tax return, eliminated from income the $2,799,820 received as a dividend from Pan-Atlantic and reported $700,180 as the sales price for the stock of the two subsidiaries. Since Waterman's tax basis for the stock totalled $700,180, no taxable gain was realized on the sale. The Commissioner, however, determined that Waterman had realized a long-term capital gain of $2,799,820 on the sale of the stock and increased its taxable income accordingly. Waterman petitioned the Tax Court for a redetermination of the asserted deficiency.

At the trial[15] Waterman attempted to establish that it was the equitable as well as the legal owner of the stock of Pan-Atlantic when the dividend was declared; that Pan-Atlantic's note for $2,799,820 was payment of the dividend while Waterman was the legal and equitable owner of the stock; and that because the dividend was declared and paid while Waterman was the legal owner and equitable owner of the stock in Pan-Atlantic, the $2,799,820 constituted a dividend paid by Pan-Atlantic to Waterman. In support of its position, Waterman pointed to Treas.Reg. § 1.61–9(c) (1957) which provides that:

> When stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller.

Waterman continually stressed the fact that it had a sound business reason for pursuing the method it followed in disposing of Pan-Atlantic and Gulf Florida. A stock sale, Waterman argued, was the only way its subsidiaries could have been sold to McLean without ICC approval, and had it not been for ICC approval the same result could have been accomplished without any taxable gain.[16]

13. The $2,500,000 McLean lent to Pan-Atlantic was borrowed from Bethlehem Steel Corporation. That loan was made immediately following the purchase of the subsidiaries' stock by Securities. The record reflects that the negotiations for the loan had been in progress for some time prior to January 21, 1955.

14. May 5, 1955, C. Lee Co., Inc., a wholly-owned subsidiary of Securities purchased substantially all of the Waterman stock for cash. July 6, McLean transferred Pan-Atlantic's note of $2,500,000 to Securities in exchange for 50,000 shares of preferred stock in Securities. The reason for this transfer was that there was a public underwriting of stock of Securities and the underwriter insisted that the $2,500,000 indebtedness not be owed by Securities' subsidiary Pan-Atlantic, in the principal sum of $2,500,000 and $299,-820, to Waterman for cash. July 21, 1958, Waterman declared a dividend in kind to Securities of the $2,500,000 note. Subsequently, Securities contributed the $2,500,000 to Pan-Atlantic as paid-in capital by marking the note paid. Later in the year, Pan-Atlantic paid Waterman $299,820 in settlement of its note. In

characterizing these facts, the dissent stated:

> McLean offered to pay $3,500,000 as the purchase price and that is precisely the amount it finally paid. When the transaction was completed, Pan-Atlantic was no richer and no poorer than it had been at the start. Only a portion of its accumulated earnings and profits had been converted to capital.

50 T.C. at 667.

15. The case was tried upon a stipulation of facts and the testimony of two witnesses, Malcolm P. McLean and Thomas Higginson, one of McLean's attorneys. The substance of their testimony is embodied in the stipulation and need not be detailed.

16. Waterman premised this argument on the fact that Pan-Atlantic's adjusted basis, for tax purposes, of its assets, less its liabilities, exceeded $3,500,000 at the time of sale. Waterman hypothesized that the transaction could have taken the form of a complete liquidation of Pan-Atlantic under Sections 332 and 334 of the Internal Revenue Code of 1954 without any change in the basis of the assets, followed by a sale of these assets by Waterman

The Commissioner did not argue that the legal or equitable ownership of the stock had passed from Waterman to Securities before the declaration or payment of the dividend on January 21. Rather, the Commissioner adopted the position that irrespective of the form of the transaction, the substance of the transaction was a payment by Securities to Waterman of $3,500,000 for the stock of the subsidiaries. The entire procedure, the Commissioner contended, was a device designed to give the appearance of a dividend to a part of the purchase price of the stock, and that no purpose was served by causing a part of the purchase of the stock to be labeled a "dividend" except the avoidance of an income tax by Waterman.

As the Tax Court correctly stated: "The crux of the problem here is whether the planned form of the transaction had sufficient substance so that it should be recognized for tax purposes." 50 T.C. at 661.[17] After reviewing the chain of events leading to the purchase agreement of January 21 and the inferences to be drawn, the court held that the note paid to Waterman by Pan-Atlantic before the sale of its stock was properly deducted as a tax exempt inter-corporate dividend.

The Tax Court reached its ultimate conclusion notwithstanding the fact that it had earlier concluded that Waterman's sole objective was to receive $3,500,000 with approximately $2,800,000 of the designated price as a dividend which would be eliminated from income and with none of the assets of the subsidiaries being removed from those companies before the sale of the stock. The court also concluded that since Pan-Atlantic did not have available sufficient

cash to pay the dividend to Waterman, it was understood between the parties that McLean would arrange promptly after the sale of the stock to supply Pan-Atlantic with sufficient funds to pay the dividend note.

Judge Tannewald, dissenting, thought that the majority had failed to recognize the basic issue: "We are not called upon to decide to whom a conceded dividend should be taxable as such but rather whether there was any dividend at all." Relying upon Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, Judge Tannewald concluded that: "The plain unadulterated fact is that no dividend was declared or paid by Pan-Atlantic to Waterman or anyone else. The note issued by Pan-Atlantic was merely a piece of paper, which served only a temporary purpose and disappeared." 50 T.C. at 667.

On appeal, the Commissioner takes the position that the Tax Court's conclusions are inconsistent with the court's own findings and are contrary to the principle that tax consequences are to be governed by the substance not the form of the transactions. The Commissioner argues that the court resolved the question in this case by applying rules applicable to situations where a regular dividend had concededly been declared and the only issue was who was to be taxed. Those rules, the Commissioner contends, are not applicable when, as in this case, the parties contemplate that a purported dividend is to be inextricably tied to the purchase price and where, as here, the amount of the dividend is not a true distribution of corporate profits. Here the distribution of funds was supplied by the buyer of the stock, with the corpora-

---

to Securities; or Pan-Atlantic could have sold its assets directly to Securities followed by a liquidation under Section 332; or Pan-Atlantic could have merged into Waterman with no change in the basis of the assets under Sections 368(a) (1) (A) and 362(b) of the Code followed by a sale of the assets to Securities.

17. Commenting upon the Tax Court's decision, Mertens, Law of Federal Income Taxation, § 9.109, at 360–61 (1961) states:

A question may arise as to whether or not a dividend was actually declared or was merely a device designed to give the appearance of a dividend to part of the purchase price paid for stock of a corporation.

tion acting as a mere conduit for passing the payment through to the seller.

We agree with the Commissioner. The so-called dividend and sale were one transaction. The note was but one transitory step in a total, pre-arranged plan to sell the stock. We hold that in substance Pan-Atlantic neither declared nor paid a dividend to Waterman, but rather acted as a mere conduit for the payment of the purchase price to Waterman.

### III.

Waterman argues, first, that the Tax Court's ultimate conclusion that the distribution from Pan-Atlantic was a dividend and not part of the purchase price is one of fact which should not be set aside unless clearly erroneous. Waterman contends that the intent of the parties has a controlling significance on the issue; that motive, intent, and conduct are matters solely within the purview of the fact-finder.

██ We are not persuaded by Waterman's argument. This Court answered a similar argument in Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818, 821.

> The problem is not one of ascertaining "intent" since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of the parties should be disregarded in characterizing the transaction for federal tax purposes.

This case hinges on the legal characterization, for federal tax purposes, of the transactions between the parties. That characterization is not a question of fact but rather one of law. See Union Planters' Nat'l Bank of Memphis v. United States, 6 Cir. 1970, 426 F.2d 115 [1970]. See also Bittker and Eustice, Federal Income Taxation for Corporations and Shareholders, 17 (2d ed. 1966).

The case was tried upon a stipulation of facts entered into by the parties and accepted by the Tax Court. It is incumbent upon this Court to inquire into the correct application of the tax law to the undisputed facts. The Tax Court's legal conclusion that the distribution here was a "dividend" and not part of the purchase price is persuasive but does not tie this Court's hands in reaching a different conclusion.

### IV.

██ Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, established that tax consequences must turn upon the economic substance of a transaction and not upon the time sequences or form of the transaction. See also Barnett v. Commissioner of Internal Revenue, 2 Cir. 1966, 364 F.2d 742. "To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation". Higgins v. Smith, 1940, 308 U.S. 473, 477–478, 60 S.Ct. 355, 357, 84 L.Ed. 406, 411. See Goldstein v. Commissioner of Internal Revenue, 2 Cir. 1966, 364 F.2d 734. But the solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect. Gregory should not be considered a "talisman of magical powers", since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. Edwards v. Commissioner of Internal Revenue, 10 Cir. 1969, 415 F.2d 578. This generalization does, however, reflect the truth that courts will look beyond the superficial formalities of a transaction to determine the proper tax treatment. See American Nat'l Bank of Austin v. United States, 5 Cir. 1970, 421 F.2d 442, petition for cert. filed, 38 U.S.L.W. 3516 (No. 1587, May 18, 1970); United States v. General Geophysical Co., 5 Cir. 1961, 296 F.2d 86; Alpha Tank's Sheet Metal Mfg. Co. v. United States, 1953, 116 F.Supp. 721, 126 Ct.Cl. 878.

Gregory involved the creation of a corporate entity for the purpose of transferring shares of stock to the taxpayer. While recognizing that a valid corporate entity was created and that

the transaction had complied precisely with the formal requirements of the statute, the Court concluded that it was "an elaborate and devious form of conveyance masquerading as a corporate reorganization. * * *" 293 U.S. at 470, 55 S.Ct. at 268, 79 L.Ed. at 599. The activities were described as

> [s]imply an operation having no business purpose or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner.

Id. at 469, 55 S.Ct. at 267, 79 L.Ed. at 599. The Court there also referred to the rule which excludes from consideration the motive of tax avoidance but determined that it was not pertinent to the situation "because the transaction upon its face lies outside the plain intent of the statute". Id. at 470, 55 S.Ct. at 268, 79 L.Ed. at 599.

Judge Learned Hand has best expressed the protean concept evolved from *Gregory*:

> If, however, the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; *for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose.* (Emphasis added.)

Gilbert v. Commissioner of Internal Revenue, 2 Cir. 1957, 248 F.2d 411–412 (dissenting on a procedural matter).

The *Gregory* principle has not been limited to corporate reorganizations, but has been applied to federal taxing statutes in general. E. g., Higgins v. Smith, *supra*; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Rutledge v. United States, 5 Cir. 1970, 428 F.2d 347 [1970]; Kanawha Gas & Utilities Co. v. Commissioner of Internal Revenue, 5 Cir. 1954, 214 F.2d 685. The words of the taxing statutes which describe commercial transactions are therefore to be understood to refer to transactions entered into for commercial purposes. Transactions entered into not for commercial purposes but only to escape taxation are suspect.[18]

*Gregory* does not per se preclude a taxpayer from decreasing his taxes or avoiding them by methods permitted by law. The application of that principle does not mean, however, that a person may reduce his tax liability by transferring his money from one pocket to another even though he uses different pairs of trousers. Minnesota Tea Co. v. Helvering, 1938, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474. We stated in *Kanawha Gas*

> In determining the incidence of taxation, we must look through form and search out the substance of a transaction. * * * This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are

---

18. "Although Gregory [v. Helvering, 293 U.S. 465 [55 S.Ct. 266, 79 L.Ed. 596] (1935)] may mean all things to all men, its essence is an instinctive judicial attitude that a transaction should not be given effect for tax purposes unless it serves a purpose other than tax avoidance. Thus, a transaction heavily laden with tax avoidance motives may be disregarded as a 'sham', or its form may be recast to reflect its economic 'substance' * * * in order to prevent overreaching taxpayers from doing indirectly what they cannot do directly." Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 555 (2d ed. 1966).

merely means by which to carry out the plan and will not separate.

214 F.2d at 691.

The inability of a taxpayer to cast what in substance is a unitary transaction in the form of a two step transaction is reflected in this Court's decision in Redwing Carriers, Inc. v. Tomlinson, 5 Cir. 1968, 399 F.2d 652. In *Redwing Carriers* the taxpayer sought to recognize an immediate gain at capital gains rates and then take a larger depreciation deduction from ordinary income by shaping what was essentially an integrated purchase and trade-in transaction of new and used motor vehicles into two separate transactions. We held that what was in substance a tax-free exchange could not be transformed into two sales by the arbitrary separation of time and exchange of cash in order to circumvent Section 1031 of the Internal Revenue Code of 1954. *See* Reef Corp. v. Commissioner of Internal Revenue, 5 Cir. 1966, 368 F.2d 125; Davant v. Commissioner of Internal Revenue, 5 Cir. 1966, 366 F.2d 874.[19]

We do not dispute that consistency of decision in the federal tax field is indispensable for taxpayers and their advisors who need to predict the tax consequences of their transactions. Yet what frequently appears on cursory examination, as a sport among tax cases, precedent is actually a permutation spawned by facts of some particular case. *See* Britt v. United States, 5 Cir. 1970, 431 F.2d 227. *Compare* Bullen v. Wisconsin, 1916, 240 U.S. 625, 630–631, 36 S.Ct. 473, 60 L.Ed. 830 *with* Proctor & Gamble Co. v. Newton, S.D.N.Y.1923, 289 F. 1013. Each case therefore must be decided on its own merits by examining the form and substance of the transactions to determine whether recognition of the form of the transaction would undermine relevant tax provision.

■ Here, McLean originally offered Waterman $3,500,000 for the stock of Pan-Atlantic and Gulf Florida. Waterman recognized that since its basis for tax purposes in the stock was $700,180, a taxable gain of approximately $2,800,000 would result from the sale. It declined the original offer and proposed to cast the sale of the stock in a two step transaction. Waterman proposed to McLean that it would sell the stock of the two subsidiaries for $700,180 after it had extracted $2,800,000 of the subsidiaries' earnings and profits. It is undisputed that Waterman intended to sell the two subsidiaries for the original offering price—with $2,800,000 of the amount disguised as a dividend which would be eliminated from income under Section 1502. Waterman also intended that none of the assets owned by the subsidiaries would be removed prior to the sale. Although the distribution was cast in the form of a dividend, the distribution was to be financed by McLean with payment being made to Waterman through Pan-Atlantic. To inject substance into the form of the transaction, Pan-Atlantic issued its note to Waterman before the closing agreement was signed. The creation of a valid indebtedness however, cannot change the true nature of the transaction. Goldstein v. Commissioner of Internal Revenue, 2 Cir. 1966, 364 F.2d 734.

■ Waterman argues that it had a sound business purpose in casting the transaction as it did: ICC regulations prohibited McLean from acquiring the

19. American Nat'l Bank v. United States, 5 Cir., 1970, 421 F.2d 442 petition for cert. filed, 38 U.S.L.W. 3516 (No. 1587, May 18, 1970); and Union Planters Nat'l Bank of Memphis, 6 Cir. 1970, 426 F.2d 115, involved the question of whether coupon interest collected by banks as owners of municipal bonds subject to a repurchase agreement with bond dealers was exempt from taxation under § 103(a) of the Code. In both cases, the Court of Appeals reversed the district courts' determination characterizing the arrangement as a sale-repurchase transaction.

In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding. 426 F.2d 118.

assets of Waterman or its subsidiaries. In the circumstances of this case, we do not dispute the soundness or the necessity of a stock acquisition rather than an asset acquisition. This argument, however, overlooks the fact that there was no requirement imposed by the ICC for dividing the stock sale into two parts. The only party that required the transaction to be cast as it was, was Waterman. Once McLean divested himself of control of Trucking, he was free to pay $3,500,000 in cash directly to Waterman without any necessity of using Pan-Atlantic as a conduit for the payment of $2,800,000 in the guise of a "dividend". An integrated transaction cannot be separated into its components for the purpose of avoiding taxation. *See* Blackstone Realty Co. v. Commissioner of Internal Revenue, 5 Cir. 1968, 398 F.2d 991.

The fact that Waterman may have cast the transaction in a different way so as to result in no taxable gain offers no solution. We concentrate on what the parties did. Wilson v. Commissioner of Internal Revenue, 5 Cir. 1958, 255 F. 2d 702, aff'g 1957, 27 T.C. 976. The form of the transaction used by the parties is relatively unimportant, for the true substance and effect of their agreement was that McLean would pay $3,-500,000 for all of the assets, rights and liabilities represented by the stock of Pan-Atlantic and Gulf Florida. It is less than realistic to suppose that the amount ultimately agreed to be paid as the purchase price under the agreement was not lessened because Waterman removed the designated surplus for the sole purpose of circumventing the adverse tax consequences. The distribution here clearly affected the quantum of the purchase price with McLean ultimately paying $3,500,000.

Waterman also argues and cites many authorities to support its position that since it was both the legal and beneficial owner of the stock when the dividend was declared, the dividend belonged to Waterman. *See, e. g.,* Steel Improvement & Forge Co. v. Commissioner of Internal Revenue, 6 Cir. 1963, 314 F.2d 96, reversing 1961, 36 T.C. 265. Those cases were concerned with corporate distributions which were concededly dividends; the only issue was determining whether the seller or the buyer of the stock was to be deemed the recipient of the dividend. Nor is the lack of a binding agreement affirmatively demonstrating that Waterman was the beneficial owner of the stock when the dividend was declared dispositive of the issue. *See* United States v. General Geophysical Company, 5 Cir. 1961, 296 F.2d 86. The Tax Court's conclusion that Waterman was in substance both the legal and beneficial owner of the stock when the dividend was declared does not answer the question whether in substance a dividend was declared.

> The test of whether events should be viewed separately or together as part of a single plan is not temporal but is functional.

Reef Corp. v. Commissioner of Internal Revenue, 5 Cir. 1966, 368 F.2d 125, 134. *See* Aull v. Commissioner of Internal Revenue, 1932, 26 B.T.A. 862.

A new horizon of tax avoidance opportunities would be opened by allowing a tax free dividend, under Section 1502, to result from the transaction here effected. Corporations with wholly-owned subsidiaries would be enabled, without difficulty, to circumvent capital gains treatment through a pre-sale extraction of earnings and profits. The Regulations promulgated under Section 1502 of the Code allow the recipient in an affiliated group of corporations to eliminate from income a "dividend distribution" received from another member of that group. A pre-sale extraction however, conflicts with the concept of a dividend as a distribution of earnings and profits made in the context of an ongoing corporation-shareholder relationship. *See generally* Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, 148 (2d ed. 1966). Potential circumvention does not stop there. If the court should accept Waterman's view of the transaction, a corporation could purchase another corporation at its

fair market value, receive its new subsidiary's earnings and profits in the form of an inter-corporate dividend, sell the subsidiary, and then claim a loss on the subsequent sale. In this light, a subsidiary's dividend declaration immediately before the complete disposition of the parent's interest in the stock of the subsidiary seems a hollow device lacking any business objective other than the extraction of earnings and profits without dividend consequences. This is especially so when there is reason to believe, as the Tax Court believed, no dividend would have been paid but for the contemplated sale.[20]

These tax avoidance implications do not however, constitute a license to courts to distort the law, to write in new provisions, or to render present provisions nullities; they do mean that we should guard against giving force to "a purported [dividend] which gives off an unmistakeably hollow sound when it is tapped." United States v. General Geophysical Co., 5 Cir. 1961, 296 F.2d 86, 89. The undisputed facts and the inferences to be drawn from the facts will not support a holding that Waterman received what in tax terms should be described functionally as a dividend from Pan-Atlantic.

Judge Goldberg, speaking for the Court in *Redwing Carriers* stated:

Taxation is transactional and not cuneiform. Our tax laws are not so supple that scraps of paper, regardless of their calligraphy, can transmute [a payment received for the sale of stock into an intercorporate tax free dividend]. A taxpayer may engineer his transactions to minimize taxes, but he cannot make a transaction appear to be what it is not. Documents record transactions, but they do not always become the sole criteria for transactional analysis.

399 F.2d at 659.

The views Judge Goldberg expressed in *Redwing Carriers* are applicable here.

The judgment of the Tax Court is reversed with directions to enter final judgment for the Commissioner.[21]

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court

20. In United States v. General Geophysical Company, 5 Cir. 1961, 296 F.2d 86, a corporation transferred certain depreciable assets to its shareholders in redemption of their stock and later the same day reacquired them for corporate notes, claiming a stepped-up basis for these assets. This Court held the transfer invalid for income tax purposes, despite the fact that there was no legal commitment on the shareholders' part to resell these assets to the corporation. We said: "The taxpayer asserts that the transactions were prompted by a valid business purpose and were effected without a motive of tax avoidance. We accept these assertions, which are supported by the trial judge's findings, as true. They lend support to the taxpayer's case, but they do not control the disposition of the case. Intent often is relevant in questions of taxation, particularly where the bona fides of a transaction is called

into question, but in most cases tax treatment depends on what was done, not why it was done. And our decision in this case rests not on the motivation of the transactions in question but rather on our conclusion that the admitted facts of the two transfers preclude a finding of a sufficient hiatus in the corporate ownership of the assets to justify bestowal of a new basis on them after the reacquisition." Id. at 90.

21. Our decision today should not be interpreted as standing for the proposition that a corporation which is contemplating a sale of its subsidiary's stock could not under any circumstances distribute its subsidiaries profits prior to the sale without having such distribution deemed part of the purchase price.

In the context of this case, we consider the distribution to be part of the purchase price and not a dividend.

having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.