**G. J. PARKHILL and Jean Parkhill,
Plaintiffs,**

**v.**

**UNITED STATES of America,
Defendant.**

**Civ. A. No. CA-5-74-5.**

United States District Court,
N. D. Texas,
Lubbock Division.

Nov. 20, 1974.

Norton Baker, Smith & Baker, Inc., Karl N. Clifford, Lubbock, Tex., for plaintiffs.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Wm. Guild, Tax Div., Dept. of Justice, Dallas Tex., for defendant.

## MEMORANDUM OPINION

WOODWARD, District Judge.

The above styled and numbered cause was tried before the court without a jury at Lubbock, Texas, on November 8, 1974. After considering the pleadings, stipulations of the parties, testimony, documents, and briefs, the court makes and enters its findings of fact and conclusions of law as follows:

### Findings of Fact

1. This is an action by plaintiffs, G. J. and Jean Parkhill, to recover income taxes, interest, and penalties for the years 1967 through 1970, plus statutory interest.

2. The issues to be decided in this case are as follows:

(a) Whether for tax purposes plaintiffs in substance made a gift of crops to their children in any year from 1964 through 1970, and created a bona fide indebtedness with their children upon which they are entitled to deduct interest.[1]

(b) Whether plaintiffs are liable for the negligence penalty assessed against them for 1967 and 1968.

(c) What is the cost of raising grain plaintiffs allegedly gave to their children in 1969?

3. During the years 1967 through 1970, G. J. Parkhill, plaintiff,[2] was a farmer in Crosbyton, Texas, with a wife and two school age children. In 1964, the children, Jimmy and Cherie, were nine and fifteen years old respectively. Plaintiff farmed approximately 2,500 acres. Approximately 60 percent of plaintiff's land was planted in cotton and 30 percent in grain.

4. Plaintiff has been a successful farmer and during the years in suit his annual net income from farming was between $20,232 and $38,913.

5. In an effort to avoid income taxes by splitting the income between himself and his wife, on the one hand, and his children on the other, plaintiff entered into arrangements purporting to give his children a portion of crops he produced, selling the crops on behalf of his children, and realizing the income by purportedly borrowing a substantial portion of the profits back from the children and paying them interest.

6. Plaintiff grew and financed the crops, and made arrangements for their storage after they were harvested. Then, plaintiff arranged for the buyers of the crops to issue checks in the names of his children. These checks were deposited in bank accounts in the names of his children. Plaintiff then had his children issue checks to him for which he executed notes to his children with interest at the rate of five percent. In this connection, plaintiff, from time to time, dealt with his children through Mr. Kenneth C. Durbin, who was designated as "custodian" for the minor children. The check back to the plaintiff represented substantially all of the proceeds from the sale of the children's share of the crops, less a proportionate share of the cost of producing same, and usually plaintiff would receive a separate check from his children for their share of such costs.

7. In order to finance, grow and sell cotton, plaintiff made all arrangements for the necessary financing, purchasing of the seeds, planting of the seeds, cultivation of the cotton, harvesting, ginning, storage, and finally the sale. Similar arrangements were necessary in growing and selling grain. In 1967, plaintiff produced 746 bales of cotton and purportedly gave 170 bales to his children. Likewise, in the other years at issue, plaintiff produced cotton and grain and attempted to split income with his children from the sale of a portion of these crops.

8. Plaintiff has purportedly borrowed a total of $29,000 from his son, Jimmy, and $23,000 from his daughter, Cherie, from 1964 to present. During these years, plaintiff has not repaid any of these principal amounts. Plaintiff, from time to time, caused his children to renew his notes covering the purported loans. Plaintiff has paid to his children claimed interest which he seeks to deduct.

9. The following are specific examples of the subject arrangements: On December 9, 1967, 69 bales of cotton owned by plaintiff were sold. Plaintiff

---

1. The years in suit in this action are 1967 through 1970, however, certain interest payments claimed to be deductible by plaintiffs resulted from alleged gifts made to their children and alleged loans from the children to plaintiffs in the years 1964, 1965, and 1966.

2. G. J. Parkhill is the principal in the subject transaction and referred to as "plaintiff" herein; his wife, Jean, was joined in this action because plaintiffs filed a joint return for the years at issue.

made all arrangements for the sale and presented the warehouse receipts which had been issued for the crops to the buyer. Plaintiff had the buyer issue a check dated December 9, 1967, for the 69 bales of cotton payable to his daughter, Cherie, in the amount of $7,926.81. Plaintiff directed Cherie to deposit the $7,926.81 check in her personal bank account, showing a rent deduction of $1,954.62, leaving the net amount deposited to her account totaling $5,972.19. On December 27, 1967, plaintiff had Cherie issue a check to him in the amount of $3,500, which was designated for "loan." On the same day, at plaintiff's direction, another check was issued by Cherie to him in the amount of $1,890, which was designated as "production cost cotton." These two checks were deposited in the plaintiff's account. Having directed Cherie to return the proceeds from the sale to him, he then executed a note to a custodian for Cherie in the amount of $3,500.

10. Plaintiff also made arrangements to place 101 bales of cotton produced by him in 1967 into a government loan program. The warehouse receipts for this cotton were given to the Agricultural Stabilization and Conservation Service as security for the loan. Plaintiff had the proceeds of the loan paid to his son, Jimmy. The amount received by Jimmy was $7,694.97. Plaintiff had Jimmy, who was 13 years old, deposit the proceeds in his bank account, less deductions for rent paid to the landowners from whom the cotton was harvested.

11. Subsequently, on December 27, 1967, plaintiff had Jimmy issue him a check for $3,500 which was designated for "loan," and a check for $1,750 which was designated for "production cost cotton." Plaintiff deposited these checks in his checking account, and issued a note to a custodian for Jimmy in the amount of $3,500.

12. Plaintiff sold his equity in this cotton to Carlock and Murdough Cotton Merchants on July 3, 1968, for six dollars per bale above the loan price previously paid to Jimmy, and deposited the proceeds into his personal bank account. Plaintiff executed a release of the warehouse receipts on July 5, 1968, and Carlock and Murdough paid off the loan, plus interest, on July 11, 1968, to the Commodity Credit Corporation.

13. In 1968, plaintiff harvested milo grain, a portion of which was delivered to Crosbyton Farmers Co-op Grain between September 3, 1968, through September 19, 1968. The Co-op, according to its records, purchased the grain from plaintiff when it was delivered. This grain was sold to Crosbyton Farmers Co-op Grain as of September 19, 1968. However, on October 1, 1968, plaintiff signed two statements, allegedly making gifts of the grain to Kenneth C. Durbin as custodian for his two children, Cherie and Jimmy. On October 3, 1968, at plaintiff's direction, the Crosbyton Farmers Co-op issued separate checks, each in the amount of $5,735, to Cherie and Jimmy. The two checks represented payments for 740,000 pounds of grain at $1.55 per hundred weight.

14. These checks were deposited in the checking accounts of Cherie and Jimmy. On November 6, 1968, at plaintiff's direction, Cherie and Jimmy each issued a check to him in the amount of $5,000. Plaintiff then executed notes to the alleged custodian for his children.

15. A similar transaction took place in 1969. Plaintiff arranged for the sale of 850,000 pounds of grain. He had the proceeds paid to his children, and immediately had the children write checks to him for a substantial part of the proceeds they received.

16. All alleged gifts of crops made by plaintiff to his children since 1964, and alleged loans from his children to him, have been handled in a manner similar to those described above.

17. Upon audit, the Commissioner of Internal Revenue determined that no gifts were made by plaintiff in 1967 and 1968. In addition, interest deductions claimed by plaintiff for 1967, 1969,

and 1970,[3] as a result of the alleged interest payments on the notes plaintiff gave to his children were disallowed because the notes did not represent a bona fide indebtedness. Further, the Commissioner asserted a penalty against plaintiff under Section 6653(a) of the Internal Revenue Code of 1954. Further, the Commissioner determined that the cost of production of crops allegedly given by plaintiff to his children in 1969 was understated.

18. As a result of the audit, an additional assessment was made against plaintiff. The assessments were paid, plaintiff filed claims for refund, and subsequently instituted this action.

19. The court finds that in substance plaintiff did not make gifts of crops to his children in any year from 1964 through 1970.

20. The court finds that no bona fide indebtedness was created between plaintiff and his children upon which he is entitled to deduct interest because plaintiff's children had no money with which to make loans to plaintiff.

21. The court finds that plaintiff is liable for the negligence penalty assessed against him for 1967 and 1968, because he intentionally disregarded the rules and regulations of the Internal Revenue Code.

22. In the alternative, the court finds that if plaintiff had made valid gifts to his children in 1969, that he understated the cost of raising grain and the adjustments made by the Internal Revenue Service with respect to this issue were correct.

23. The court finds that plaintiff is not entitled to recover in this action.

24. Any conclusion of law deemed to be a finding of fact is hereby adopted as a finding of fact.

### Conclusions of Law

■ 1. This court has jurisdiction of this action and the parties pursuant to 28 U.S.C. § 1346(a)(1). Tax consequences must turn upon economic substance of the transaction and not upon the time sequence or form of the transaction, and the courts will look beyond the superficial formalities of the transaction to determine the proper tax treatment. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1935); Waterman Steamship Corp. v. Commissioner, 430 F.2d 1185 (5th Cir. 1970).

2. The court is required to examine the substance and not merely the form of the transaction. Commissioner v. Danielson, 378 F.2d 771 (3rd Cir. 1967).

3. To permit the true nature of the transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. Commissioner v. Court Holding Co., *supra.*

■ 4. Under Section 163 of the Internal Revenue Code of 1954, interest is only deductible if paid on bona fide indebtedness. Coffey v. Commissioner, 141 F.2d 204 (5th Cir. 1944); Johnson v. Commissioner, 86 F.2d 710 (2nd Cir. 1936).

■■ 5. It is a general rule that, in order to complete a gift, the donor must do everthing reasonably permitted by nature of the property and the circumstance of the transaction in parting with all incidents of ownership. Continued possession, dominion, and control over the subject matter of the gift and the fruits thereof afford ample basis for taxation of the income to the donor. Coffey v. Commissioner, *supra;* Weil v. Commissioner, 82 F.2d 561 (5th Cir. 1930), cert. denied, 299 U.S. 552, 57 S.Ct. 14, 81 L.Ed. 406 (1930).

■ 6. This court concludes that the purported gifts to Jimmy and Cherie were ineffective under state law. *See*

---

3. No interest payments were deducted in 1968.

Silber v. Southern National Life Ins. Co., 326 S.W.2d 715 (Tex.Civ.App., 1959). *See* also, the prerequisites for making a completed gift. Weil v. Commissioner, *supra.*

7. The plaintiff claims two separate tax benefits from the transaction. The first of these is to shift the taxability of his farm income from himself to his children through arguing that he made gifts of crops.

8. Secondly, plaintiff claims the right to taxable deductions for interest paid on the alleged loans between his children and himself. The real question presented to the court is whether the gifts and subsequent loans are valid or are without substance. The lack of validity is indicated by the extent of the direction and control exercised over the money by Parkhill. This court has found that these loans were made by the children to their father without independence and at the direction of their father. In essence, it was not the children who exercised the dominion of ownership over the money—it was their father. The plaintiff's exercise of dominion over these monies is at odds with his children's ownership of the proceeds. To this extent, this case is quite similar to those in which the validity of a trust for the benefit of children is in issue. *See* Audano v. United States, 428 F.2d 251 (5th Cir. 1970), where the taxpayer claimed rental deductions for property transferred to his children's trusts and leased back to him. The Court held that the lack of independence by the trustees in approving the lease back transaction would cause the trusts to be treated as a nullity. As the trusts were a nullity and the ownership of the property still resided in the father, he could not be paying rent for the property to others.

9. Here the record is even more conclusive. There was no trust or legal guardianship to protect the interests of Jimmy and Cherie; their "decision" to loan money to Parkhill is completely without independence. In reality, the dominion and ownership of the money was never transferred from the plaintiff. At the conclusion of the transaction, Parkhill was in the same financial position as if he had never engaged in this maneuver. He had the money from his crops in his bank account; the real effect of the transaction was to shift the income tax burden to his children who were in a lower tax bracket than he, and to create an artificial interest deduction. The only loser in this game was the public treasury.

10. Under Section 6653(a) of the Internal Revenue Code of 1954, a penalty is asserted for intentional disregard of rules and regulations.

11. A taxpayer is not entitled to a deduction for the cost of production of crops for which he has made a gift.

12. This case presents nothing more than a taxpayer and his wife each year, about the time a crop was to be harvested, purportedly transferring a part of the crops on their land under current production by gift to their children for the purpose of shifting income tax liability—the part of the crops purportedly given being determined by the market price at such time and the maximum that could be given to each child without adverse consequences under the gift tax law. The gift was not made until the crop was almost a certainty and the amount that would be paid therefor was assured to the taxpayer. At least three factors convince this court that the transactions lacked any real substance and were a mere sham to shift and evade tax liability. First, the person who benefited the most from both the tax consequences and cash flow, Mr. Parkhill, was in complete control of all the transactions. The proceeds from the sale of the crops purportedly given would be deposited in the children's bank accounts and a check for production expenses on this part of the crop would then be given on the children's account to the taxpayer. A substantial portion of the balance of the proceeds would then be paid to taxpayer, at his direction, who would then

execute a note or notes to his children in a corresponding amount. In following years, interest was paid to the children on these notes by the taxpayer for which he claimed deductions, but the principal on the notes is still unpaid. These notes do not appear to be a bona fide transaction. Second, the loans from the children to the taxpayer occurred so quickly after the purported gifts as to appear part of a prearranged scheme, the sole purpose of which was to distribute the plaintiff's income among members of the family unit and reduce the tax consequences to the plaintiffs. Third, the loans were so routinely made each year after the purported gifts as to appear part of this same prearranged scheme. These transactions cannot be deemed to have been performed with good faith, but were a part of a scheme which constitutes a sham to evade payment of income tax by the taxpayer. To permit this procedure to stand would amount to reducing the tax laws in this respect to a nullity.

13. Any finding of fact deemed to be a conclusion of law is hereby adopted as a conclusion of law.

The Clerk will furnish a copy hereof to each attorney.